**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **KAREN BOOK,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No. 5:19-cv-06076-RK** |
| | ) | |
| **AMERICAN FAMILY MUTUAL** | ) | |
| **INSURANCE COMPANY, S.I.,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant American Family Mutual

Insurance Company, S.I. ("American Family") offers the following Memorandum in Support of

its separate Rule 56 Motion for Summary Judgment.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................. 1

II. STATEMENTS OF UNCONTROVERTED MATERIAL FACT ................................. 2

    A. Plaintiff's employment with American Family in Saint Joseph, Missouri ........... 2

    B. For several years before termination of her employment, Plaintiff received only fair and positive treatment from leadership ..................................... 4

    C. Unbeknownst to her leadership or Employee Relations, Plaintiff organized and held a "team building" event with live firearms/ammunition and simulations containing violent imagery ................................. 6

        1. Plaintiff planned and announced the event without obtaining any approvals or others' thoughts on a firearm-centric event .......................... 6

        2. The Frontier Justice Event included graphic, violent simulations of an office shooting and a school shooting, forcing participants to make "kill or be killed" decisions ............................................. 8

    D. American Family terminated Plaintiff's employment after learning of the "team building" event, based on Plaintiff's violation of American Family policy and her demonstration of poor judgment as a leader ............................... 10

    E. Contrary to her allegations, American Family did not "replace" Plaintiff with a substantially younger employee ............................................. 14

    F. Plaintiff's age did not serve as the motivating factor in American Family's termination of her employment. In fact, not even Plaintiff believes it did .......... 15

    G. Plaintiff does not seek front pay or punitive damages ......................... 17

III. SUMMARY JUDGMENT STANDARD .................................................. 18

IV. ARGUMENT ...................................................................... 19

    A. On the first relevant prima facie element: The uncontroverted facts show Plaintiff did not meet American Family's job expectations in holding the Frontier Justice Event .................................................. 20

    B. On the second relevant prima facie element: The uncontroverted facts show the absence of any "additional showing" that age served as the motivating factor in terminating Plaintiff's employment .................................... 21

        1. American Family did not "replace" Plaintiff. Reallocation of her duties to Beauford is insufficient as a matter of law to satisfy the prima facie element ................................................. 22

        2. The uncontroverted facts show no other circumstances to satisfy the "additional showing" requirement or an inference of age discrimination .................................................. 23

i

C.      No triable issue exists as to American Family's legitimate, non-
        discriminatory reason for terminating Plaintiff's employment, entitling
        American Family to summary judgment ............................................................ 24

D.      American Family is entitled to summary judgment on any claims for front
        pay or punitive damages ..................................................................................... 29

V.   CONCLUSION ................................................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Baxter Healthcare Corp.*,
13 F.3d 1120 (7th Cir. 1994) .................................................28

*Barnes v. GenCorp Inc.*,
896 F.2d 1457 (6th Cir. 1990) ...............................................22

*Bradley v. Harcourt, Brace & Co.*,
104 F.3d 267 (9th Cir. 1996) ................................................24

*Brooks v. Tri Systems, Inc.*,
425 F.3d 1109 (8th Cir. 2005) ...............................................19

*Buck v. American Family Mut. Ins. Co.*,
No. 4:12-CV-1879, 2014 WL 272343 (E.D. Mo. Jan. 24, 2014) ..........................26

*Buhrmaster v. Overnite Transp. Co.*,
61 F.3d 461 (6th Cir. 1995) .................................................24

*Carraher v. Target Corp.*,
503 F.3d 714 (8th Cir. 2007) ................................................27

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).....................................................18, 19

*Chambers v. Metropolitan Property and Cas. Ins.*
351 F.3d 848, 855-56 (8th Cir. 2003) ..........................................22, 23

*City of Warrensburg v. RCA Corp.*,
550 F. Supp. 1364 (W.D. Mo. 1982) .........................................19

*Davidson & Associates v. Jung*,
422 F.3d 630 (8th Cir. 2005) ................................................19

*Dorsey v. Pinnacle Automation Co.*,
278 F.3d 830 (8th Cir. 2002) ................................................26

*EEOC v. City of Independence, Mo*,
No. 04-0877, 2005 WL 2898021 (W.D. Mo. Oct. 31, 2005) ..................................28

*EEOC v. McDonnell Douglas Corp.*,
191 F.3d 948 (8th Cir. 1999) ................................................28

iii

*Farnsworth v. Covidien, Inc.*
No. 4:08-cv-01689, 2010 WL 147812 (E.D. Mo. Jan. 11, 2010) ....................................20, 21

*Frevert v. Ford Motor Co.*,
614 F.3d 466 (8th Cir. 2010) ...................................................................................................26

*Gibson v. American Greetings Corp.*,
670 F.3d 844 (8th Cir. 2012) ...................................................................................................19

*Gladue v. Saint Francis Medical Center*,
No. 1:13-CV-186, 2015 WL 3795817 (E.D. Mo. June 18, 2015) ...........................................24

*Grossman v. Dillard Dep't Stores, Inc.*,
109 F.3d 457 (8th Cir. 1997) ...................................................................................................24

*Guimaraes v. SuperValu, Inc.*,
674 F.3d 962 (8th Cir. 2012) ...................................................................................................28

*Hanebrink v. Brown Shoe Company*,
110 F.3d 644 (8th Cir. 1997) ..............................................................................................22, 27

*Hanson v. F.D.I.C.*,
13 F.3d 1247 (8th Cir. 1994) ...................................................................................................19

*Harvey v. Anheuser-Busch, Inc.*,
38 F.3d 968 (8th Cir. 1994) .....................................................................................................26

*Haywood v. Lucent Technologies*,
169 F. Supp. 2d 890 (N.D. Ill. 2001) .......................................................................................24

*Hazen Paper Co. v. Biggins*,
507 U.S. 604 (1993).................................................................................................................27

*Johnson v. AT&T Corp.*,
422 F.3d 756 (8th Cir. 2005) ...................................................................................................19

*Johnson v. Ready Mixed Concrete Co.*,
424 F.3d 806 (8th Cir. 2005) ...................................................................................................26

*Johnson v. Safe Auto Insurance Company*,
No. 15-00259, 2015 WL 12806579 (W.D. Mo. Aug. 5, 2015) ...............................................29

*Jones v. United Parcel Service, Inc.*,
No. 03-0284, 2005 WL 1009572 (W.D. Mo. April 7, 2005)....................................................28

*Kehoe v. Anheuser-Busch, Inc.*,
96 F.3d 1095 (8th Cir. 1996) ...................................................................................................28

iv

*Kratzer v. Rockwell Collins, Inc.*,
  398 F.3d 1040 (8th Cir. 2005) ........................................................21

*Krein v. DBA Corp.*,
  327 F.3d 723 (8th Cir. 2003) ..........................................................19

*LeGrant v. Gulf & Western Manufacturing Company*,
  748 F.2d 1087 (6th Cir. 1984) ........................................................27

*Logan v. Value City Department Stores, LLC*,
  No. 4:08-cv-19, 2008 WL 1914168 (E.D. Mo. April 28, 2008).................29

*Lovelace v. Washington University School of Medicine*,
  931 F.3d 698 (8th Cir. 2019) ..........................................................28

*Lowe v. J.B. Hunt Transp., Inc.*,
  963 F.2d 173 (8th Cir. 1992) ..........................................................23

*Martin v. O'Fallon Modern Dentistry*,
  No. 4:19-cv-396, 2019 WL 2342657 (E.D. Mo. June 3, 2019).................28

*Martinez v. W.W. Grainger, Inc.*,
  664 F.3d 225 (8th Cir. 2011) ..........................................................26

*Mathes v. Furniture Brands Intern, Inc.*,
  266 F.3d 884 (8th Cir. 2001) ..........................................................20

*Meyer by Wyrick v. Litwiller*,
  749 F. Supp. 981,983 (W.D. Mo. 1990) ...........................................19

*Naguib v. Trimark Hotel Corp.*,
  No. 15-CV-3966, 2017 WL 598760 (D. Minn. Feb. 14, 2017).................22

*National Ass'n of Home Builders v. Norton*,
  298 F. Supp. 2d 68 (D.C. Cir. 2003)................................................30

*Onyiah v. St. Cloud State Univ.*,
  684 F.3d 711 (8th Cir. 2012) .......................................................25, 27

*Proud v. Stone*,
  945 F.2d 796 (4th Cir. 1991) ..........................................................24

*Robinson v. Monaghan*,
  864 F.2d 622 (8th Cir. 1989) ..........................................................19

*Rollins v. Missouri Dep't of Conservation*,
  315 F. Supp. 2d 1011 (W.D. Mo. 2004) ............................................27

v

*Rose-Maston v. NME Hospitals*,
133 F.3d 1104 (8th Cir. 1998) ........................................................................27

*Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*,
444 F.3d 961 (8th Cir. 2006) ....................................................................19, 20

*Schroeder v. Shawano County*,
870 F.Supp.2d 622 (E.D. Wis. 2012)..............................................................28

*Smith v. Dollar General Corp.*,
No. 09-4188, 2010 WL 4537041 (W.D. Mo. Nov. 2, 2010) ............................20

*St. Mary's Honor Center v. Hicks*,
509 U.S. 502 (1993)..........................................................................................25

*Stidham v. Minnesota Mining and Manufacturing Inc.*,
399 F.3d 935 (8th Cir. 2005) (abrogated on other grounds)............................22

*Stuart v. General Motors Corp.*,
217 F.3d 621 (8th Cir. 2000) ...........................................................................25

*Torgerson v. City of Rochester*,
643 F.3d 1031 (8th Cir. 2011) .........................................................................18

*Wagner v. Gallup, Inc.*,
788 F.3d 877 (8th Cir. 2015) ...........................................................................20

*Ward v. International Paper Co.*,
509 F.3d 457 (8th Cir. 2007) ...........................................................................23

*Williams v. City of New York*,
No. 12-CIV-8518, 2014 WL 1383661 (S.D.N.Y. March 26, 2014)..................28

**Statutes**

Mo. Rev. Stat. § 213.010(2) ......................................................................................20

Mo. Rev. Stat. § 213.055.1(1)....................................................................................20

**Other Authorities**

Fed. R. Civ. P. 26(a)(1)...............................................................................................17

Fed. R. Civ. P. 56(a) ...................................................................................................19

## I.  INTRODUCTION

This case is simple and straightforward. On February 5, 2018, American Family terminated Plaintiff's employment upon her superiors learning about a disturbing "team building" event she held—unbeknownst to them—just two weeks before Christmas 2017 at the Frontier Justice shooting range in Kansas City, Kansas ("Frontier Justice Event"). In mid to late January 2018, when her superiors learned the details of the event after a subordinate complained, Plaintiff's poor judgment (and policy violations) irreparably damaged her credibility as a manager and leader at American Family. Details of the event included:

- An email announcement—a surprise—that left some subordinates ("Team Managers") feeling compelled to participate in the event, which occurred during working time;

- Participation in live-fire shooting range activities and graphic/violent simulations (including a school shooting complete wounded and bloodied students), which left some Team Managers feeling disturbed;

- Plaintiff's suggestion after the event that the team use a gun-toting photo as its holiday card to American Family business partners; and

- Plaintiff's apparent efforts to keep particulars of the event away from her boss, Tim Johnston, even after he inquired about it in late January 2018.

Given the troubling nature of the event and the aftermath, Plaintiff's superiors determined termination of her employment served as the appropriate action. Indeed, Johnston described himself as "visibly shaken" as he learned the details and discovered Plaintiff's poor judgment.

Despite the above events leading to termination of her employment, Plaintiff incredibly claims her age (57 years old[1]) served as the motivating factor in the termination decision. She makes that claim based on her own disbelief in the real reason for termination of her employment. Plaintiff's own disbelief aside, the facts are clear age played no role. For example:

---

[1] Ages listed in this Memorandum reflect ages on February 5, 2018, the date American Family terminated Plaintiff's employment.

1

- The documentation and testimony of Johnston and Candy Embray (the decision-makers) plainly support the Frontier Justice Event as the reason for terminating Plaintiff's employment.

- Plaintiff has not alleged any age-related comments or conduct.

- Johnston and Embray were 59 years old and 54 years old respectively when they made the decision. In fact, the Team Manager who complained in January 2018 was 58 years old at the time.

- Plaintiff claims American Family "replaced" her with April Beauford (37 years old). But, Beauford held the same position as her (Operations Manager). When Plaintiff's employment ended, American Family reallocated her duties to Beauford, who continued performing her other duties as well.

- Before the event, Plaintiff testified she received nothing but positive and fair treatment from Johnston and Embray.

Indeed, even Plaintiff has acknowledged the Frontier Justice Event as the reason for termination of her employment, which she has done explicitly in letters to third parties and in her deposition.

It is inescapable that no triable issue exists as to a *prima facie* case or the absence of pretext, thus entitling American Family to summary judgment on Plaintiff's age discrimination claim.

## II.    STATEMENTS OF UNCONTROVERTED MATERIAL FACT ("SOF")

### A.    Plaintiff's employment with American Family in Saint Joseph, Missouri

1.    After working for American Family for several years, Plaintiff obtained her first managerial position in July 2005. She became a Billing Resolution Team Manager. Deposition of Plaintiff Karen Book ("Plaintiff Dep.") (Ex. 1) at 55:7–11, 56:13–22.

2.    Thereafter, Plaintiff received at least two promotions. *Id.* at 56:23–57:2, 58:1–14.

3.    In November 2014, Plaintiff assumed a position as a Sales & Service Care Center Operations Manager ("Operations Manager"). *Id.* at 57:10–16, 58:1–14. She held that position for the remainder of her employment with American Family. *Id.* at 90:7–23.

2

4.     In the Sales & Service Care Center—essentially a call center—Plaintiff supervised a group of seven Team Managers who, in turn, supervised teams of representatives selling and servicing American Family insurance products for new or existing insureds. *Id.* at 59:13–60:8, 91:14–92:22; *see generally* Job Description for AF Sales & Service Care Center Operations Manager ("Job Description") (Ex. 2), authenticated at Plaintiff Dep. (Ex. 1) at 93:5–94:4.

5.     Plaintiff worked closely with her Team Managers and her Director to deliver, implement, and support sales and/or service plans to deliver positive results. *See* Job Description (Ex. 2), pp. 1–3.

6.     Beyond the technical responsibilities of her Operations Manager position, Plaintiff had responsibility for overall culture and work environment under her control. Plaintiff understood that responsibility included (a) demonstrating good judgment; (b) creating a positive work culture; and (c) ensuring employees had a comfortable, safe environment. *See id.*; Plaintiff Dep. (Ex. 1) at 71:13–73:2, 74:25–76:4, 94:5–95:18; *see also* Code of Ethics and Business Conduct ("Code") (Ex. 3) at pp. 2, 4–5, 10–11, authenticated at Plaintiff Dep. (Ex. 1) at 70:7–71:5.

7.     Plaintiff also knew that, as a member of management, she had to set an example for other employees, including related to integrity, good judgment, culture, and policy compliance. American Family expected Plaintiff to comply with its Code, which she understood. *See* Code (Ex. 3), p. 5; Plaintiff Dep. (Ex. 1) at 70:18–73:2. That Code stated as follows:

> Company leaders and managers are expected to follow all of the above requirements and set an example of good ethical behavior for all individuals. Company leaders and managers are also expected to:
>   . . .
> - Create a culture within American Family which promotes the highest standards of ethics and compliance.

Ex. 3, p. 5.

8.     Those culture-related responsibilities were important in the Sales & Service Care Center, which can be a stressful work environment. Plaintiff Dep. (Ex. 1) at 92:16–93:4.

**B.     For several years before termination of her employment, Plaintiff received only fair and positive treatment from leadership.**

9.     While serving as an Operations Manager, Plaintiff reported to Tim Johnston (Director, Sales & Service Care Center). In fact, Johnston supervised Plaintiff for the last five and a half (approximately) years of her employment. Plaintiff Dep. (Ex. 1) at 61:2–4, 96:6–21.

10.     Plaintiff and Johnston had a positive working relationship throughout their entire supervisor-subordinate relationship. *Id.* at 97:9–18 (in testifying about her working relationship with Johnston, she described it as "a good working relationship" and "[w]e got along well"). As Plaintiff admits, Johnston treated Plaintiff fairly—and positively—throughout his time managing her, including in various forms of recognition and in performance reviews. *Id.* at 97:9–98:23, 102:12–17, 132:23–133:11.[2]

11.     With respect to recognitions, Johnston:

a.     Advocated for and provided Plaintiff several pay raises in his time supervising her, with the most recent occurring in August 2016. *Id.* at 61:5–15, 98:19–23, 131:2–13; Declaration of Tim Johnston ("Johnston Decl.") (Ex. 4) at ¶ 5(a)[3]; August 2016 Compensation Change (Ex. 5), authenticated at Johnston Decl. (Ex. 4) at ¶ 5(a).

b.     Secured discretionary bonuses for Plaintiff, including in November 2017. Plaintiff Dep. (Ex. 1) at 61:5–11, 62:9–25, 98:19–23, 131:2–13, 133:3–8; Johnston Decl. (Ex. 4) at ¶ 5(b); November 2017 One-Time Payment (Ex. 6), authenticated at Johnston Decl. (Ex. 4) at ¶ 5(b).

c.     Provided personal notes to Plaintiff thanking her for work, including one just before Christmas 2017, thanking her for her "leadership, support, and dedication in

---

[2]The **only** criticism Plaintiff provided as to Johnston's supervision was that he could have gotten involved in some of Vestal's complaints to HR about Plaintiff. Plaintiff Dep. (Ex. 1) at 98:1–8.

[3]Where electronic signatures are used on Declarations cited herein, American Family is complying with the Court's *CM/ECF Civil and Criminal Administrative Procedures Manual and Users Guide* and will retain originally executed copies of the declarations.

4

2017."[4] Plaintiff Dep. (Ex. 1) at 121:24–122:3, 127:8–130:22; Christmas 2017 Note (Ex. 7), authenticated at Plaintiff Dep. (Ex. 1) at 127:8–129:16.

12.    As Plaintiff testified, she and Johnston "had a good working relationship," and Johnston treated her fairly. *Id.* at 97:9–98:23, 102:12–17, 132:23–133:11.

13.    That fair treatment also extended beyond pay raises, bonuses, and notes, and into performance reviews. For example, in January 2018, Johnston provided Plaintiff's 2017 Annual Performance Review ("2017 Review").[5] 2017 Review (Ex. 10), authenticated at Plaintiff Dep. (Ex. 1) at 120:20–121:11; Plaintiff Dep. (Ex. 1) at 123:14–24.

14.    In the 2017 Review, Johnston gave Plaintiff an overall "As Expected" rating, i.e., she "meets, and sometimes exceeds the expectations of the role." 2017 Review (Ex. 10), p. 1; Plaintiff Dep. (Ex. 1) at 104:1–8, 123:14–24.

15.    The 2017 Review contained numerous positive comments on Plaintiff's performance, lauding her for progress and development as a leader, and complimented her for a "strong year of building her team," while also acknowledging some opportunities to improve. *See generally* 2017 Review (Ex. 10), p. 2; Plaintiff Dep. (Ex. 1) at 123:14–24.

16.    Johnston's boss, Candy Embray (Vice President, Sales & Service Operations), also had involvement in treating Plaintiff both fairly and positively. Plaintiff Dep. (Ex. 1) at 98:24–99:2, 101:17–25.

---

[4]Plaintiff admits she had not disclosed to Johnston the nature of the December 11, 2017, Frontier Justice Event, *infra* Part C, by the time he gave her the complimentary note in December 2017. Plaintiff Dep. (Ex. 1) at 130:3–10. Johnston merely knew Plaintiff had planned and took her Team Managers for an offsite holiday event. *Id.* at 162:25–168:21; November 2017 and January 2018 WWOs (Exs. 8 & 9), authenticated in forgoing citation; Johnston Decl. (Ex. 4) at ¶ 9.

[5]Similar to the note referenced in footnote 4, *supra*, Plaintiff received the 2017 Review before she disclosed the nature of the Frontier Justice Event to Johnston. Again, Johnston knew only that Plaintiff had taken her Team Managers for a holiday outing. *See supra*, footnote 4 and citations therein; Plaintiff Dep. (Ex. 1) at 120:20–121:14; Johnston Decl. (Ex. 4) at ¶ 9.

5

17. For example, in the Fourth Quarter of 2017, Embray appointed Plaintiff to lead a newly-formed Culture Council for the entire Sales & Service Care Center. *Id.* at 123:25–125:23.

18. According to Plaintiff, Embray appointed her to "Culture Champion" after expressing appreciation for Plaintiff's role in a focus group after a culture survey. *Id.*

19. Plaintiff considered the Culture Champion role a recognition by Embray of her positive performance. *Id.*

### C. Unbeknownst to her leadership or Employee Relations, Plaintiff organized and held a "team building" event with live firearms/ammunition and simulations containing violent imagery.

#### 1. Plaintiff planned and announced the event without obtaining any approvals or others' thoughts on a firearm-centric event.

20. As Operations Manager, Plaintiff occasionally planned and held team building events for her Team Managers, i.e., the seven first-level managers reporting directly to her. *Id.* at 126:7–16; Johnston Decl. (Ex. 4) at ¶ 6. Before December 2017, those events had included things like painting parties and Kansas City Royals games. Deposition of Andrew Tunks ("Tunks Dep.") (Ex. 11) at 45:10–23.

21. In November 2017, Plaintiff decided to plan a "team building" event taking "several of us out of our comfort zone." *See* January 2018 WWO (Ex. 9), p. 3; *see also* November 28 Announcement Email ("Announcement Email") (Ex. 12), authenticated at Plaintiff Dep. (Ex. 1) at 183:12–16. Specifically, she decided to hold the Frontier Justice Event on December 11, 2017, for "team building." *Id.*; Plaintiff's Responses to American Family's First Request for Admissions ("Admissions") (Ex. 13) at Request No. 1.

22. Plaintiff planned the Frontier Justice Event—at American Family's expense—to occur during the work day. In other words, Plaintiff and her Team Managers spent working time

attending and participating in the event. Admissions (Ex. 13) at Request No. 1; Plaintiff Dep. (Ex. 1) at 156:18–25.

23.     Plaintiff organized the Frontier Justice Event to include (1) a one-and-a-half-hour session at Frontier Justice's shooting range and (2) a one-hour session in Frontier Justice's simulator room. Announcement Email (Ex. 12), p. 1.

24.     In a November 28, 2017, email, Plaintiff announced the Frontier Justice Event to her Team Managers. In doing so, Plaintiff described the event in part as follows:

> We're heading to Frontier Justice to try our hand at range shooting and to learn something about gun safety. This may not be on your bucket list, but it's important to do something outside of your comfort zone once in a while! It's also good to have knowledge about guns with all the news stories we read and with all the talk about gun control.

*Id.*

25.     The November 28 email further described use of 9mm handguns at the shooting range and time in a simulator to "help hone your accuracy and decision-making skills." *Id.*

26.     Plaintiff's November 28 email served as the first notice her Team Managers received on the nature of the "team building" event. Indeed, before her November 28 email, Plaintiff had not discussed the event with Team Managers, sought their input, or gauged their comfort level with a work event surrounding firearms use.[6] Plaintiff Dep. (Ex. 1) at 145:18–23, 183:17–23, 185:17–186:2; Announcement Email (Ex. 12), p. 1.

27.     Further, Plaintiff's November 28 email did not communicate to Team Managers (a) any description of the violent imagery Team Managers would come to see at the event; (b) any

---

[6] Plaintiff had discussed the Frontier Justice Event with Angie Praiswater (Team Manager) before the November 28 announcement because Praiswater assisted her in planning it. Plaintiff also communicated with Tiffany Turpin (Team Manager) about her interest in shooting a gun. Plaintiff Dep. (Ex. 1) at 144:5–145:3, 162:19–24.

7

option to decline participation; or (c) any other choice related to the firearms-centric event. Indeed, the only choice conveyed to Team Managers related to selection of a restaurant for a pre-event lunch. *See generally* Announcement Email (Ex. 12); Plaintiff Dep. (Ex. 1) at 183:12–185:16.[7]

28.     Plaintiff also did not consult with her superiors (Johnston and Embray), Employee Relations, or American Family policy about the event before she announced it to her team. *See supra* footnotes 4 & 5 (Plaintiff did not consult with Johnston before the event); Plaintiff Dep. (Ex. 1) at 162:3–18. Plaintiff's superiors and Employee Relations learned about the Frontier Justice Event only **after** it occurred and only when Dee Vestal (Team Manager) reported it. Johnston Decl. (Ex. 4) at ¶ 7-8, 13; Declaration of Candy Embray ("Embray Decl.") (Ex. 17) at ¶ 4-5; Declaration of Cindy Byington ("Byington Decl.") (Ex. 18) at ¶ 3-4; Plaintiff Dep. (Ex. 1) at 167:20–168:21 (the January 2018 WWO submitted to Johnston on January 29, 2018 (Ex. 9), served as Plaintiff's first notification to him of the nature of the December 11 "team building" event).

**2.     The Frontier Justice Event included graphic, violent simulations of an office shooting and a school shooting, forcing participants to make "kill or be killed" decisions.**

29.     On December 11, 2017, Plaintiff and her Team Managers attended the Frontier Justice Event. There, they used real handguns and live ammunition to fire at shooting range targets. They also used realistic handguns to participate in the facility's simulator. Plaintiff Dep. (Ex. 1) at 157:1–158:17; Tunks Dep. (Ex. 11) at 58:13–59:4.

---

[7]In her deposition, Plaintiff agreed the simulations were "possibly" violent and observed "what might be violent to you might not be violent to me." *Id.* at 148:6–13. What is considered violent is in the eye of the beholder. *Id.* at 159:25–3. Others confirmed the simulations were realistic and contained violence. *See* Deposition of Dee Vestal ("Vestal Dep.") (Ex. 14) at 45:16–46:24 (describing her reaction to the simulations); Deposition of Stephanie Bush ("Bush Dep.") (Ex. 15) at 47:22–50:5 (same); Deposition of Kevin Williams ("Williams Dep.") (Ex. 16) at 34:12–35:18, 38:15–39:8 (describing the simulations as violent but less so than some modern video games, which are "really violent and gory"); Tunks Dep. (Ex. 11) at 57:10–59:16.

30.     With respect to the simulator, it placed participants in scenarios used to train highway patrol and police officers on decision-making. Plaintiff Dep. (Ex. 1) at 147:23–148:5, 194:19–25.

31.     While the simulator scenarios started with having the participant shoot inanimate objects like watermelons, plates, and clay pigeons, the scenarios became more graphic and violent as the session progressed. *Id.* at 158:21–159:7; Vestal Dep. (Ex. 14) at 46:3–14; Tunks Dep. (Ex. 11) at 57:10–58:22.

32.     Scenarios included an office shooting, a school shooting, and a parking lot confrontation. In the school shooting scenario, for example, the simulator placed participating Team Managers in a school environment depicting individuals (including teens) lying on the ground, shot and bloodied, while the participant must engage shooters. *See supra* SOF 31 and citations therein; Plaintiff Dep. (Ex. 1) at 148:14–16, 150:13–151:17, 152:12–17, 154:9–14, 160:6–20.

33.     The simulator presented "shoot or don't shoot" decisions for participating Team Managers. *See supra* SOF 31 & 32 and citations herein.

34.     At least two of the participating Team Managers (Vestal and Stephanie Bush) found the Frontier Justice Event—and the simulator, in particular—disturbing and/or inappropriate. *See* Vestal Dep. (Ex. 14) at 45:16–46:24, 47:5–13 (Describing some simulations as "really scarier ones" and stating "I thought they were too realistic, and it seemed [] like I was shooting real people, and that bothered me a lot."); *see also* Bush Dep. (Ex. 15) at 47:11–50:5, 53:5–24, 55:13–56:10 (describing the experience as "not pleasant," explaining her husband's prior experience in a school shooting, and describing her feelings toward posing for a photo with guns).

9

35.     While both Vestal and Bush expressed excitement at the Frontier Justice Event's announcement, (1) they felt pressure to do so and (2) Plaintiff did not disclose the nature of the simulations before the event occurred. Vestal Dep. (Ex. 14) at 34:1–39:3, 50:25–51:9, 74:1–10; Bush Dep. (Ex. 15) at 44:15–24, 72:22–75:8; Plaintiff Dep. (Ex. 1) at 184:14–185:16; Announcement Email (Ex. 12), p. 1.

36.     After the Frontier Justice Event, Plaintiff also suggested to her Team Managers that a picture from the event—with some Team Managers (not Vestal or Bush) holding large guns— could be used as a Christmas card for American Family's business partners. Admissions (Ex. 13) at Request No. 2 (Plaintiff admitting she suggested "a picture of some of the team members holding guns at Frontier Justice could be used as a Christmas card for American Family's business partners.").

37.     Both Vestal and Bush spoke up to suggest alternatives to such a Christmas card, suggesting a holiday backdrop as "a picture more suited to sending holiday greetings (just with the way of the world these days!)." Gun Photo Emails (Ex. 19), p. 1, authenticated at Plaintiff Dep. (Ex. 1) at 199:14–200:8.

**D.    American Family terminated Plaintiff's employment after learning of the "team building" event, based on Plaintiff's violation of American Family policy and her demonstration of poor judgment as a leader.**

38.     In mid-January 2018, Vestal raised concerns with Embray about the Frontier Justice Event. Specifically, she shared her discomfort with the event, the suggested Christmas card, and the graphic/violent nature of the simulations. Email from Vestal to Embray re: "3 Things" (Ex. 20), authenticated at Vestal Dep. (Ex. 14) at 51:19–53:3, 60:1–13; Embray Decl. (Ex. 17) at ¶ 4.

10

39.     Vestal's report served as the first notice Plaintiff's superiors (or Employee Relations) had of the event's nature, despite Plaintiff having had previous opportunities to disclose those details herself. *See supra* SOF 28 and citations therein.

40.     Following Vestal's report, Embray notified Johnston and Cindy Byington (Employee Relations) of Vestal's concerns related to the Frontier Justice Event. Embray Decl. (Ex. 17) at ¶ 5.

41.     In late January 2018, Byington interviewed multiple Team Managers who participated in the Frontier Justice Event, including Vestal, Bush, Andrew Tunks, and Kevin Williams. Byington Decl. (Ex. 18) at ¶ 3, 5.

42.     Byington heard both Vestal and Bush express feeling pressure to participate. Byington also heard each express dismay at what ultimately occurred at Frontier Justice, particularly with the simulations, their graphic/violent nature, and the decision-making involved (i.e., whether to shoot an individual). Byington Decl. (Ex. 18) at ¶ 6(c).

43.     Bush also revealed to Byington her husband's prior experience in a school shooting, which caused her additional discomfort. Byington Decl. (Ex. 18) at ¶ 6(d).

44.     On the other hand, Tunks (a former police officer) and Williams did not take issue with the event. However, they confirmed Plaintiff never sought Team Managers' input before announcing the event. Byington Decl. (Ex. 18) at ¶ 6(e).

45.     On January 29, 2018, Plaintiff submitted another WWO document to Johnston. In it, she stated the nature of the December 11 "team building" event for the first time:

> My managers and I went off-site on Dec. 11th and enjoyed time team building and learning about guns, shooting and safety. I know this took several of us out of our comfort zone, but it was a fun and interesting activity."

January 2018 WWO (Ex. 9), p. 3. Plaintiff had previously described the event as only a "small

holiday celebration." November 2017 WWO (Ex. 8), p. 4.

46.     The next day, Johnston added comments to the WWO document to question the event and Plaintiff's decision-making: "Team building around guns, shooting and safety? How did you identify this for team building and was everyone comfortable with this outing? Trying to better understand this and was this the holiday outing?" January 2018 WWO (Ex. 9), p. 3; Johnston Decl. (Ex. 4) at ¶ 10; Plaintiff Dep. (Ex. 1) at 166:18–169:8.

47.     In response on January 30, 2018, Plaintiff claimed to have had discussions with Team Managers about the event in planning it and that she "talked about doing something outside of some of our comfort zones, learning gun safety and having knowledge about guns due to all the press regarding gun laws and gun control."[8] January 2018 WWO (Ex. 9), p.3.

48.     On January 30, Johnston received more information on the Frontier Justice Event from Byington's efforts, including:

      a.     Plaintiff's November 28 email announcing the event;

      b.     Information on Plaintiff's Christmas card suggestion;

      c.     Details on the live-fire shooting range activities;

      d.     Description of the graphic/realistic simulations (including an office shooting and a school shooting), including that some were disturbed by the content and decision-making involved; and

      e.     Information on some Team Managers feeling pressure to participate and that they did not feel the event was optional.

Johnston's "Note to File" re: Plaintiff ("Note to File") (Ex. 21), pp. 2–4, authenticated at Johnston Decl. (Ex. 4) at ¶ 11-12; Byington Decl. (Ex. 18) at ¶ 6-7.

---

[8]Plaintiff admits subjects like active shooter training and gun safety are outside her responsibilities as Operations Manager. Plaintiff Dep. (Ex. 1) at 87:14–88:17.

12

49.     Beyond the limited information in Plaintiff's January 2018 WWO, the information Byington shared was all new to Johnston. In his notes, Johnston described being "visibly shaken and upset in listening to [Byington] share the information due to recent events of mass shootings across the country." Johnston Decl. (Ex. 4) at ¶ 11-12; Note to File (Ex. 21), p. 3.

50.     Johnston believed the Frontier Justice Event demonstrated Plaintiff's "poor judgment as a leader" and that "her actions here not reflective of a leader and our expectations," particularly given her role leading the Culture effort. Johnston Decl. (Ex. 4) at ¶ 12, 14; Note to File (Ex. 21), pp. 3–4.

51.     Embray shared Johnston's concerns. They decided (with Byington's support) to terminate Plaintiff's employment based on (1) the demonstration of poor judgment and leadership and (2) violation of certain American Family policies. Johnston Decl. (Ex. 4) at ¶ 14-15; Embray Decl. (Ex. 17) at ¶ 6-7; Byington Decl. (Ex. 18) at ¶ 8-9. Byington supported the decision. Byington Decl. (Ex. 18) at ¶ 8-9.

52.     With respect to policy, they determined Plaintiff's conduct in planning and holding the Frontier Justice Event implicated American Family's Code of Conduct & Business Ethics (the "Code") and the Workplace Violence Prevention Policy. Johnston Decl. (Ex. 4) at ¶ 14; Embray Decl. (Ex. 17) at ¶ 7; Service Letter Response (Ex. 22), pp. 1–2, authenticated at Embray Decl. (Ex. 17) at ¶ 7. To wit:

    a.     The Code provides generally that "[i]ntegrity starts with the example set by management and the character and good judgment of every individual. . . . Company leaders and managers are expected to . . . set an example of good ethical behavior for all individuals." Code (Ex. 3), p. 4.

    b.     The Code prohibits distributing inappropriate information, including violent material. *Id.* at p. 7. In her deposition, Plaintiff agreed that the prohibition extends beyond American Family's electronic resources to prohibit an employee from sharing violent images with another generally. Plaintiff Dep. (Ex. 1) at 73:7–74:20. The Frontier

Justice included showing Team Managers violent images in the simulator. *See supra* SOF 27 and footnote 7.

        c.     The Code prohibits using American Family resources "to advance your own personal political activities," including by suggesting American Family "is involved with or supportive of a candidate **or issue**." Code (Ex. 3), pp. 16–17. By Plaintiff's own statements, she used the Frontier Justice Event to bring attention to divisive political issues related to gun laws and gun control. Announcement Email (Ex. 12), p. 1; January 2018 WWO (Ex. 9), p. 3; Plaintiff Dep. (Ex. 1) at 177:3–23.

        d.     American Family's Workplace Violence Prevention Policy prohibits employees "from carrying firearms or weapons while they are in the course of their employment, regardless of whether they are on company property or at a location where firearms or weapons are otherwise allowed." Workplace Violence Prevention Policy (Ex. 23), p. 1, authenticated at Plaintiff Dep. (Ex. 1) at 84:3–14. Plaintiff agreed in her deposition that the prohibition on firearms included off-site work functions. Plaintiff Dep. (Ex. 1) at 86:18–87:13. The Frontier Justice Event resulted in Team Managers carrying/using firearms during a work function, during work hours. *See supra* SOF 22–23.

53.     On February 5, 2018, Johnston and Embray met with Plaintiff and communicated the decision to terminate her employment. Plaintiff Dep. (Ex. 1) at 209:3–25.

54.     On February 6, 2018, Byington notified American Family's security in Saint Joseph, Missouri of the termination given the issues leading to termination related to guns. Byington Decl. (Ex. 18) at ¶ 11.

55.     Plaintiff acknowledges coaching or disciplinary action would have been appropriate for the Frontier Justice Event, but she contends termination of her employment went too far as a disciplinary action. Plaintiff Dep. (Ex. 1) at 212:16–214:13 (Plaintiff disagreed with the level of discipline and believed coaching/written warning could have been appropriate), 142:18–143:2 (the level of discipline is up to the decision-maker).

### E.    Contrary to her allegations, American Family did not "replace" Plaintiff with a substantially younger employee.

56.     Following termination of Plaintiff's employment, American Family did not recruit to fill her position. Embray Decl. (Ex. 17) at ¶ 11.

14

57.     Instead, American Family reallocated Plaintiff's job duties as an Operations Manager to consolidate them with another existing Operations Manager position. Embray Decl. (Ex. 17) at ¶ 11; Plaintiff Dep. (Ex. 1) at 136:19–137:4.

58.     Specifically, American Family reallocated Plaintiff's duties to April Beauford, one of Plaintiff's peers already working as an Operations Manager, in addition to her existing duties. Embray Decl. (Ex. 17) at ¶ 11; Plaintiff Dep. (Ex. 1) at 136:19–137:4.

59.     American Family maintained that lower Operations Manager headcount after Plaintiff's employment ended. Embray Decl. (Ex. 17) at ¶ 12.

60.     As of February 5, 2018, Beauford was 37 years of age.

**F.      Plaintiff's age did not serve as the motivating factor in American Family's termination of her employment. In fact, not even Plaintiff believes it did.**

61.     The only action or decision Plaintiff challenges in this lawsuit is the termination of her employment on February 5, 2018. She contends her age (57 years old on that date) served as the motivating factor for termination of her employment. Plaintiff Dep. (Ex. 1) at 39:23–40:1.

62.     Plaintiff does not claim American Family took any other action or made any other decision motivated by her age. She also does not claim experiencing any age-related comments or conduct during her employment with American Family. *See* Plaintiff's First Supplemental Responses to Defendant's First Interrogatories ("Interrogatory Responses") (Ex. 24) at Interrogatory No. 8, authenticated at Plaintiff Dep. (Ex. 1) at 18:6–19:1.

63.     Those individuals involved in the events leading to termination of Plaintiff's employment are well-within the protected age category and close to Plaintiff in age (or older). As of February 5, 2018 (the date of termination):

        a.      Johnston was 59 years old;

        b.      Embray was 54 years old;

> c.   Vestal was 58 years old; and
>
> d.   Bush was 48 years old.

Johnston Decl. (Ex. 4) at ¶ 18; Embray Decl. (Ex. 17) at ¶ 10; Vestal Dep. (Ex. 14) at 6:17–18;

Bush Dep. (Ex. 15) at 5:12–13.

> 64.   In an April 6, 2018, letter to the National Rifle Association ("NRA"):
>
> a.   Plaintiff described the termination of her employment with American Family as "a recent occurrence that happened to me as a result of taking my team to a shooting range to learn gun safety."
>
> b.   She sought the NRA's assistance in making sure "people are aware of American Family Insurance's true stance on gun ownership when they are making their insurance choices. . . ."
>
> c.   Plaintiff acknowledged specifically that she "**wasn't terminated for any age, race, nationality, sexuality, etc. issue.**" Yet, she expressed her feeling that "being terminated in the manner I was and for the reason I was [i.e., the Frontier Justice Event], was unjust."

*See generally* NRA Letter (Ex. 25), authenticated at Plaintiff Dep. (Ex. 1) at 32:18–23; *see also*

Plaintiff Dep. (Ex. 1) at 235:5–10 ("[T]he reason I was," as used in the NRA letter referred to the

Frontier Justice Event).

> 65.   In an April 6, 2018, letter to Frontier Justice:
>
> a.   Plaintiff again stated: "The reason I was terminated was due to 'misconduct and poor professional judgment/leadership' due to my 'decision to organize a 'team building event' to a shooting range.'"
>
> b.   She also reiterated her contact with the NRA to "share this information with the public so they are aware that although American Family wants to help their customers 'protect their dreams,' they find gun ownership, gun safety and the simulations offensive."

*See generally* Frontier Justice Letter (Ex. 26), authenticated at Plaintiff Dep. (Ex. 1) at 235:18–22.

> 66.   Plaintiff had multiple communications with American Family employees about the

termination of her employment after it occurred, but she did not raise her age in any of those

communications. Plaintiff Dep. (Ex. 1) at 245:17–246:1.

16

67.     Plaintiff further acknowledged during her deposition that American Family terminated her employment for planning and holding the Frontier Justice Event. *Id.* at 195:6–17, 205:5–13, 246:2–11.[9] In doing so, Plaintiff recognized that concerns could have existed with her judgment and it could have been appropriate to coach her or issue a written warning. *See supra* SOF 55.

68.     At her deposition, Plaintiff offered the following beliefs as to why American Family terminated her employment:

      a.     She did not believe the Frontier Justice Event was the real reason, including based on her performance record;

      b.     American Family saved money in terminating her employment; and

      c.     She lacked technology and social media skills younger individuals possess. Plaintiff Dep. (Ex. 1) at 134:7-135:6; 135:12-13, 137:10-138:11; 141:16-142:15; 267:9-268:6.

**G.     Plaintiff does not seek front pay or punitive damages.**

69.     Fed. R. Civ. P. 26(a)1)(A)(iii) requires a party to provide in her initial disclosures "a computation of each category of damages claimed. . . ."

70.     Plaintiff's Amended Complaint states Plaintiff seeks judgment "in excess of $25,000, for attorney's fees, and costs incurred and for such other further relief as this Court deems appropriate and just." Plaintiff's Amended Complaint (Ex. 28), p. 4 "WHEREFORE" clause.

---

[9]Plaintiff testified as follows:
  Q. Absent the December 11 event at Frontier Justice, do you have any reason to believe American Family would have terminated your employment?
  A. No.
  Q. Every – everything – the – the road to termination of your employment started after the event, right?
  A. Correct.
Plaintiff Dep. (Ex. 1) at 246:2–11.

17

71.     In Plaintiff's Initial Disclosures, she states that she seeks lost wages (including bonuses, benefits, and sick leave), interest on back pay, emotional distress damages, and costs and attorneys' fees. Plaintiff's Initial Disclosures (Ex. 27), pp. 2–3.

72.     Interrogatory No. 16 to Plaintiff sought, in part, "a separate statement of each item of damage claimed (including, but not limited to, economic, physical, emotional, psychological, or punitive damages)." Interrogatory Responses (Ex. 24) at Interrogatory No. 16.

73.     In her First Supplemental Responses to Defendant's First Interrogatories, Plaintiff referenced her Initial Disclosures and provided further information on her back pay damages. *Id.*

74.     In her deposition, Plaintiff confirmed that her Initial Disclosures and her response to Interrogatory No. 16 completely stated the damages she seeks in this lawsuit. Plaintiff Dep. (Ex. 1) at 258:2–16.

75.     Neither Plaintiff's Initial Disclosures nor her response to Interrogatory No. 16 make any reference to a claim for front pay and/or punitive damages. *See supra* SOF 69–71 and citations therein.

## III.     SUMMARY JUDGMENT STANDARD

Summary judgment is not a disfavored procedural shortcut, but it is instead "a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir. 2011) (citation omitted). As such, there is no "'discrimination case exception' to the application of summary judgment. *Id*. Rather, summary judgment is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986). The Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). As the moving party, American Family need not negate Plaintiff's entire claim, but need only point out to the court insufficient evidence on *any* essential element of Plaintiff's claim. *See Hanson v. F.D.I.C.,* 13 F.3d 1247, 1253 (8th Cir. 1994); *see also Meyer by Wyrick v. Litwiller*, 749 F. Supp. 981,983 (W.D. Mo. 1990).

Once the movant demonstrates the absence of a genuine issue of fact, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Gibson v. American Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012); Rule 56(c)(1). Plaintiff can therefore avoid summary judgment only if she is able to present "specific facts" showing there is a genuine issue for trial. *Robinson v. Monaghan*, 864 F.2d 622, 624 (8th Cir. 1989); *Davidson & Associates v. Jung,* 422 F.3d 630, 638 (8th Cir. 2005) (the nonmoving party must submit more than unsupported self-serving allegations; the nonmoving party must provide sufficient probative evidence to allow the nonmoving party to prevail). The nonmoving party cannot rely on inadmissible evidence and/or "speculation or suspicion." *See Brooks v. Tri Systems, Inc.,* 425 F.3d 1109, 1111 (8th Cir. 2005); *see also Krein v. DBA Corp.,* 327 F.3d 723, 726 (8th Cir. 2003). Plaintiff also cannot escape summary judgment by merely setting forth what she hopes to establish at trial. *See City of Warrensburg v. RCA Corp.,* 550 F. Supp. 1364, 1388 n.14 (W.D. Mo. 1982).

## IV. ARGUMENT

In the absence of any claim that direct evidence exists, the Court analyzes Plaintiff's age discrimination claim under the Missouri Human Rights Act ("MHRA") using the *McDonnell-Douglas* burden-shifting framework. *See e.g., Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.,* 444 F.3d 961, 964 (8th Cir. 2006); *Johnson v. AT&T Corp.,* 422 F.3d 756, 764 (8th Cir. 2005).

19

Under that framework, the initial inquiry is whether a triable issue exists as to *prima facie* case of unlawful discrimination. *See Mathes v. Furniture Brands Intern, Inc.,* 266 F.3d 884, 887 (8th Cir. 2001). The relevant *prima facie* elements of an age discrimination claim under the MHRA include:[10] (1) Plaintiff met American Family's applicable job expectations and (2) "some additional showing" that age was the motivating factor in her termination. *See Smith v. Dollar General Corp.*, No. 09-4188, 2010 WL 4537041 at *3 (W.D. Mo. Nov. 2, 2010); Mo. Rev. Stat. §§ 213.010(2) & 213.055.1(1)(a). If a triable issue exists on those *prima facie* elements, then the inquiry turns to whether a triable issue exists on American Family's legitimate, non-discriminatory reasons for termination as a pretext for unlawful discrimination. *See Wagner v. Gallup, Inc.*, 788 F.3d 877, 885–86 (8th Cir. 2015) (explaining the *McDonnell-Douglas* burden-shifting framework in an age discrimination case); *see also Schierhoff*, 444 F.3d at 964–65 (same). Here, no triable issue exists as to either inquiry. The facts show Plaintiff's claim cannot survive.

A.  **On the first relevant *prima facie* element: The uncontroverted facts show Plaintiff did not meet American Family's job expectations in holding the Frontier Justice Event.**

In *Farnsworth v. Covidien, Inc.,* the United States District Court for the Eastern District of Missouri found the absence of the first relevant *prima facie* element in circumstances similar to those before this Court. In *Farnsworth*, the court granted summary judgment for the employer where the plaintiff's conduct failed to comply with the employer's polices and other expectations. No. 4:08-cv-01689, 2010 WL 147812 at *16 (E.D. Mo. Jan. 11, 2010). Specifically, the court described the plaintiff as having "conducted herself in a way that was unprofessional and disrespectful. She also violated [the employer's] workplace policies on numerous occasions." *Id.* The court went on to conclude: "This type of performance cannot be said to be at a level that meets

---

[10]In this Motion, American Family does not contest that Plaintiff is within the protected age category or that she suffered an adverse employment action.

[the employer's] legitimate expectations," thus failing to establish a *prima facie* case. *Id.*; *see also Kratzer v. Rockwell Collins, Inc.,* 398 F.3d 1040, 1047 (8th Cir. 2005) (a plaintiff's qualification for her position is evaluated by whether the employee "actually performs her job at a level that [meets her] employer's legitimate expectations.") (internal citations omitted).

Here, the uncontroverted facts establish Plaintiff failed to meet American Family's legitimate expectations and/or comply with applicable policies. As Plaintiff acknowledged and the Code shows, American Family holds managers to a higher standard in adhering to policy and demonstrating good judgment. [SOF 6-7] Plaintiff knew that during her employment. [SOF 7] Yet, she planned and held the Frontier Justice Event, failing to vet it through her superiors or Employee Relations, and failing to even check to see if it violated policies. [SOF 28] It did. [SOF 52] Specifically, the Frontier Justice Event:

- Had Plaintiff and her Team Managers possessing firearms during a work event, which she acknowledges violated the Workplace Violence Policy;

- Plaintiff exposed her Team Managers to violent images, which she acknowledges violated American Family's expectations as expressed in the Code;

- Brought attention to divisive political issues related to gun laws and gun control, which Plaintiff's own statements acknowledge as a purpose of the event contrary to the Code;

[SOF 27, 29, 31-32, 34, 38, 52] In addition, American Family also determined Plaintiff's poor judgment in holding the Frontier Justice Event ran contrary to its values in providing a welcoming and safe work environment. [SOF 6, 50-51]

Similar to the plaintiff in *Farnsworth*, Plaintiff did not meet American Family's legitimate performance expectations as a manager. With that, no triable issue exists on the first *prima facie* element and American Family is entitled to judgment as a matter of law on Plaintiff's claim.

**B. On the second relevant *prima facie* element: The uncontroverted facts show the absence of any "additional showing" that age served as the motivating factor in terminating Plaintiff's employment.**

21

*American Family did not "replace" Plaintiff. Reallocation of her duties to Beauford is insufficient as a matter of law to satisfy the* prima facie *element.*

Courts ordinarily consider replacement with a substantially younger individual sufficient to satisfy the "additional showing" element. *Chambers v. Metropolitan Property and Cas. Ins.* Co., 351 F.3d 848, 855-56 (8th Cir. 2003). But, that is not so where the plaintiff's duties "either have been eliminated or must be redistributed within the employer's remaining work force." *Id.* at 855. Under those circumstances, a plaintiff is not "replaced" and courts look for "some additional evidence that age played a role in [her] termination." *Id.* at 856; *Naguib v. Trimark Hotel Corp.*, No. 15-CV-3966, 2017 WL 598760 at *11 (D. Minn. Feb. 14, 2017) (employee is not "replaced" for purposes of *prima facie* analysis if position is not filled and duties are reallocated to existing employee(s) who continue pre-existing duties).[11]

Here, American Family did not "replace" Plaintiff with any other employee. Much like the *Naguib* case, American Family reallocated Plaintiff's duties to an existing, albeit younger, peer of Plaintiff's (Beauford), who also continued performing her existing duties as an Operations Manager. [SOF 57-58, 60] Thereafter, American Family did not hire an additional Operations Manager, instead operating with a lower headcount. [SOF 59] The reallocation of Plaintiff's duties to Beauford is insufficient as a matter of law to satisfy the *prima facie* element.[12] Thus, a triable

---

[11]In *Naguib*, while younger employees assumed the plaintiff's duties after her termination, they did so while continuing to perform pre-existing duties. Such "replacement" did not satisfy the *prima facie* inquiry. 2017 WL 598760 at *11 ("A person is replaced only when another person is hired or reassigned to perform the plaintiff's duties."); *see also Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (same).

[12]The result is the same in reduction-in-force cases in which younger individuals assume duties of the displaced plaintiff. *See Hanebrink v. Brown Shoe Company*, 110 F.3d 644, 646 (8th Cir. 1997) (younger employee assuming job responsibilities of displaced employee is insufficient alone to prove a *prima facie* case); *Stidham v. Minnesota Mining and Manufacturing Inc.*, 399 F.3d 935, 939 (8th Cir. 2005) (abrogated on other grounds) ("the mere fact that younger persons took on some of [the plaintiff's] responsibilities is not sufficient evidence of age discrimination"). Courts reason that a "younger employee assum[ing] some of plaintiff's duties does not establish a

issue exists only if there is some "additional showing"—beyond the unsupported replacement contention—that age was the motivating factor in the termination decision.

> 2. *The uncontroverted facts show no other circumstances to satisfy the "additional showing" requirement or an inference of age discrimination.*

Beyond replacement by a substantially younger individual, the "additional showing" element can take the form of "either statistical evidence (such as a pattern of forced early retirement or failure to promote older employees) or 'circumstantial' evidence (such as comments and practices that suggest a preference for younger employees)." *Chambers*, 351 F.3d at 855 (internal citations omitted). The uncontroverted record shows the absence of either form of evidence. First, Plaintiff does not have and cannot offer statistical evidence to satisfy the *prima facie* element. Indeed, it is clear from Plaintiff's own deposition testimony and discovery responses that her claim is founded on the termination of her employment and **her employment only**. [SOF 61-62]

Second, Plaintiff concedes no circumstantial evidence exists to support a *prima facie* showing. Plaintiff has never alleged any age-related comments or conduct.[13] [SOF 62] And, any suggestion Johnston and/or Embray discriminated against Plaintiff based on age is simply unreasonable. Plaintiff testified to the positive/fair treatment she received from both right up until they learned about the Frontier Justice Event, which included raises, discretionary bonuses, positive reviews, and recognition for the Culture Champion role. [SOF 10-18] *See, e.g.*, *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173, 174–75 (8th Cir. 1992) ("simply incredible" to suggest a company developed aversion to older people less than two years after hiring a member of protected

---

prima facie case because often at least one younger worker receives some of the plaintiff's duties." *Ward v. International Paper Co.,* 509 F.3d 457, 461 (8th Cir. 2007). That reasoning applies here.

[13]Plaintiff's Amended Complaint contains no such allegations. And, in response to American Family's discovery, Plaintiff identified termination of her employment as the only purported discrimination or otherwise inappropriate conduct.

group); *see also Grossman v. Dillard Dep't Stores, Inc.*, 109 F.3d 457, 459 (8th Cir. 1997) (unreasonable to infer discrimination where same decision-maker hired and fired plaintiff, all while a member of the protected class).[14]

Also significant, Johnston and Embray were 59 and 54 years old respectively when they terminated Plaintiff's employment. [SOF 63] Any suggestion of age animus strains credulity. *See Gladue v. Saint Francis Medical Center*, No. 1:13-CV-186, 2015 WL 3795817 at *7 (E.D. Mo. June 18, 2015) ("[N]o reasonable juror could draw the conclusion that, in a situation where all the key players to the termination are in the same protected group, the protected characteristic was a motivating factor in the termination decision"); *Haywood v. Lucent Technologies*, 169 F. Supp. 2d 890, 912 at n. 7 (N.D. Ill. 2001) (finding "strong inference of nondiscrimination" where the plaintiff and decision maker were in the same class).

No triable issue exists on the "additional showing" *prima facie* element. Indeed, the facts stand contrary to any suggestion of discriminatory animus. Without any facts supporting an inference of age discrimination, American Family is entitled to summary judgment.

### C. No triable issue exists as to American Family's legitimate, non-discriminatory reason for terminating Plaintiff's employment, entitling American Family to summary judgment.

Assuming, *arguendo*, a triable issue exists on Plaintiff's *prima facie* case, the next inquiry is whether a triable issue exists on American Family's legitimate, non-discriminatory reasons for

---

[14]Other courts also reject any discriminatory inference when the plaintiff received favorable treatment from the same decision-maker who ultimately terminated employment. *See, e.g., Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) ("One is quickly drawn to the realization that claims that employer animus exists in termination but not in hiring seem irrational. From the standpoint of the putative discriminatory, it hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job."); *see also Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270–71 (9th Cir. 1996) (summary judgment for employer where alleged discriminator was same individual who hired plaintiff about a year earlier); *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class.").

termination as a pretext for unlawful discrimination. American Family terminated Plaintiff's employment for the Frontier Justice Event. Nothing in the record suggests that legitimate, non-discriminatory reason is "unworthy of credence because it has no basis in fact" or "that discriminatory animus more likely motivated" American Family's actions toward Plaintiff. *See Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012) (affirming summary judgment for the employer in a Title VII and ADEA case).[15]

Plaintiff's actions in planning and holding the Frontier Justice Event demonstrated exceedingly poor judgment and leadership, ran counter to American Family's values, and violated its policies. [SOF 50-52] To wit:

- Plaintiff planned the event in a vacuum, failing to consult her superiors, Employee Relations, or policy.

- She similarly left Team Managers in the dark until the event had been planned and announced, even still not sharing the graphic/violent scenes to come.

- In doing so, Plaintiff put some Team Managers in a position where they felt compelled to respond positively, attend, and participate.

- Once there, in violation of American Family policy, Plaintiff had her team use real guns and live ammunition at a work event. Then, again in violation of American Family policy, she exposed her team to graphic/violent images (including bloody scenes in a simulated school shooting). The scenes left some Team Managers disturbed.

- She also admittedly used the event as commentary on gun laws and gun control, which also violated American Family policy.

[SOF 26-29, 35, 42, 44, 52] Then, after the event, Plaintiff suggested a gun-toting photo as the team's holiday card, forcing Vestal and Bush to speak up against it. [SOF 36-37] When Johnston heard those details, he described himself as "visibly shaken" given recent mass shootings. [SOF

---

[15]Merely disputing the legitimate reason for an adverse action is insufficient to create a triable issue on pretext. *See Stuart v. General Motors Corp.,* 217 F.3d 621, 634 (8th Cir. 2000). Pretext exists only where (1) the reason is false **and** (2) discrimination is the real reason. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993) (internal citations omitted).

49] His ample concerns with Plaintiff's judgment and leadership led to the determination that her employment had to end, to which Embray agreed. [SOF 50-52] Employee Relations supported the decision. [SOF 51] *See, e.g., Martinez v. W.W. Grainger, Inc.*, 664 F.3d 225, 230 (8th Cir. 2011) (leadership deficiencies are legitimate, non-discriminatory reasons for termination); *Frevert v. Ford Motor Co.,* 614 F.3d 466, 470 (8th Cir. 2010) (policy violations); *Harvey v. Anheuser-Busch, Inc.,* 38 F.3d 968, 973 (8th Cir. 1994) (plaintiff's poor judgment); *Buck v. American Family Mut. Ins. Co.,* No. 4:12-CV-1879, 2014 WL 272343 at *9 (E.D. Mo. Jan. 24, 2014) (misconduct, policy violations, and conduct contrary to expectations of management).

American Family had a legitimate (and substantial) basis for terminating Plaintiff's employment. Indeed, Plaintiff has either admitted to each of the details above or had no basis to dispute them, even acknowledging (1) the Frontier Justice Event was the reason for terminating her employment and (2) it could have been appropriate to discipline her for the event, just not terminate her employment.[16] [SOF 55, 64-67] Given the above, it is unfathomable that Plaintiff's conduct would not result in termination of employment. Nothing suggests American Family's reason for terminating Plaintiff's employment served as pretext for intentional discrimination.

Despite that, Plaintiff's testimony suggests she will point to certain thin, subjective bases for believing American Family discriminated against her. None of those bases are based in fact and none demonstrate pretext. As discussed above, supra Part IV.B.1, Plaintiff falsely claims

---

[16]When courts examine an employer's articulated reasons for a business decision, they "do not sit as super-personnel departments to second-guess the business decisions of employers [rather] the threshold question is . . . whether [the employer's] reasons for its employment actions are true, not if they are wise, fair, or correct." *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 837 (8th Cir. 2002); *see also Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 812 (8th Cir. 2005) ("Whether we (the court) might believe that (the employer) was unduly harsh in its treatment of (the employee) however, is not a matter to be considered in deciding this appeal."). Therefore, it stands to reason that it is not Plaintiff's province either to determine the appropriate level of disciplinary action for her misconduct. *See id.*

American Family replaced her with a substantially younger individual (Beauford). However, even if American Family did replace Plaintiff with Beauford, such a fact alone is insufficient to withstand summary judgment at the pretext stage. *Onyiah*, 684 F.3d at 719–20 (merely "pointing to younger professors who are paid more . . . does not create a material issue of fact at the pretext stage") (citing *Carraher v. Target Corp.*, 503 F.3d 714, 719 (8th Cir. 2007).[17]

Plaintiff also professes her subjective beliefs that (1) the Frontier Justice Event did not serve as the real reason for termination of employment, (2) American Family saved money by terminating her employment, and (3) she lacked technology/social media skills possessed by younger individuals. [SOF 68] None is sufficient to survive summary judgment. As to each, Plaintiff's subjective beliefs and conclusions do not enter the Court's equation in evaluating pretext. *See LeGrant v. Gulf & Western Manufacturing Company*, 748 F.2d 1087, 1090-91 (6th Cir. 1984); *Rollins v. Missouri Dep't of Conservation*, 315 F. Supp. 2d 1011, 1023–24 (W.D. Mo. 2004) (finding the plaintiff's general, subjective beliefs insufficient to withstand summary judgment); *Rose-Maston v. NME Hospitals*, 133 F.3d 1104, 1109 (8th Cir. 1998) (plaintiff's "unsubstantiated and conclusory allegations are insufficient to support an inference of pretext"). As to (2), even if Plaintiff had evidence to support her theory, "cost savings" are not indicative of age animus[18] and terminating an employee to save money does not run afoul of age discrimination

---

[17]In the *Carraher* case, the court held: "Although Carraher was replaced by someone substantially younger than him, in this case 28 years younger, we have previously held that this fact, though necessary to establish a *prima facie* case, possesses 'insufficient probative value to persuade a reasonable jury that [plaintiff] was discriminated against.'" 503 F.3d at 719 (citations omitted).

[18]The Supreme Court, the Eighth Circuit, and this Court (as well as others) have held as much. E.g., *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 608-609 (1993) (finding factors correlated with age, such as pension status and seniority, motivating an employer's decision does not violate the ADEA); *Hanebrink v. Brown Shoe Company*, 110 F.3d 644, 647 (8th Cir. 1997) ("[e]mployment decisions motivated by characteristics other than age (such as salary and pension benefits), even when such characteristics correlate with age, do not constitute age discrimination");

laws.[19] And, as to (3), there is simply no evidence on Plaintiff's technology and/or social media skills in comparison to younger individuals, or her treatment in that regard. To the contrary, Plaintiff admits Johnston and Embray treated her positively and fairly, including in reviews.

Last, Plaintiff may also point to her prior positive employment record for pretext. That effort would be similarly unsuccessful. Plaintiff engaged in misconduct and violated American Family policies, and a positive prior work history does not insulate her from the disciplinary consequences of her conduct. [SOF 52] *See Lovelace v. Washington University School of Medicine,* 931 F.3d 698, 706 (8th Cir. 2019) ("[A]n employee's prior satisfactory service does not insulate her from adverse consequences following a later lapse in performance"); *see also Jones v. United Parcel Service, Inc.,* No. 03-0284, 2005 WL 1009572 at *19 (W.D. Mo. April 7, 2005) ("[A]n employer is free to rely more heavily on recent performance than past performance"); *Guimaraes v. SuperValu, Inc.,* 674 F.3d 962, 975 (8th Cir. 2012) ("Evidence of a strong employment history will not alone create a genuine issue of fact regarding pretext and

---

*EEOC v. McDonnell Douglas Corp.,* 191 F.3d 948, 951 (8th Cir. 1999) (affirming summary judgment of district court's finding that an employer acting on factors that may correlate with age, such as retirement eligibility, salary, and seniority, do not constitute age discrimination); *EEOC v. City of Independence, Mo,* No. 04-0877, 2005 WL 2898021 at *5 (W.D. Mo. Oct. 31, 2005) (affirming grant of summary judgment that an employer taking action on factors that may correlate with age, such as years of service, does not constitute age discrimination under the MHRA). "Courts apply the same analysis under both the ADEA and the MHRA." *Kehoe v. Anheuser-Busch, Inc.,* 96 F.3d 1095, 1101 at n.8 (8th Cir. 1996).

[19] *Anderson v. Baxter Healthcare Corp*., 13 F.3d 1120, 1126 (7th Cir. 1994) (finding plaintiff could not prove age discrimination even if he was fired simply because his employer desired to reduce its salary costs by discharging him); *Martin v. O'Fallon Modern Dentistry*, No. 4:19-cv-396, 2019 WL 2342657 *3 (E.D. Mo. June 3, 2019) ("the ADEA does not make cost-saving terminations illegal"); *Williams v. City of New York*, No. 12-CIV-8518, 2014 WL 1383661 at *11 (S.D.N.Y. March 26, 2014) ("An employer who fires an employee solely to save money on pension payments or other financial contributions does not, for that reason alone, engage in age discrimination under the ADEA."); *Schroeder v. Shawano County*, 870 F.Supp.2d 622, 630 (E.D. Wis. 2012) (employer treating plaintiff differently than younger employees in an effort to save money is not actionable under the ADEA).

28

discrimination."). That is particularly the case where Plaintiff agrees her conduct could have warranted disciplinary action. [SOF 55] And, though she disagrees with the level, it is neither her nor the Court's province to second-guess the level of discipline American Family issued. *See supra* footnote 16 and citations therein.

The uncontroverted record demonstrates American Family had a legitimate, non-discriminatory reason for terminating Plaintiff's employment. The record also shows the absence of pretext in that reason. No triable issue exists and American Family is entitled to judgment as a matter of law on Plaintiff's age discrimination claim.

### D. American Family is entitled to summary judgment on any claims for front pay or punitive damages.

Finally, even if the Court declines to grant summary judgment on Plaintiff's single count of age discrimination, American Family is entitled to summary judgment on any claim for front pay or punitive damages. American Family is so entitled because Plaintiff has never pleaded or otherwise indicated that she seeks front pay or punitive damages. To wit:

- Plaintiff's Amended Complaint makes no reference to front pay or punitive damages whatsoever. Instead, the Amended Complaint states that Plaintiff seeks judgment "in excess of $25,000, for attorney's fees, and costs incurred and for such other and further relief as this Court deems appropriate and just."[20] Plaintiff's failure to plead certain damages means she cannot recover them. *Johnson*, 2015 WL 12806579 at *2 ("because they were not were specifically pled, punitive damages are currently not legally recoverable by Plaintiff under Missouri law"). [SOF 70]

- In her Initial Disclosures that she seeks "[c]urrent and expected lost wages, including bonuses, benefits, and sick leave." Plaintiff's Initial Disclosures also stated she seeks interest on back pay, damages for "humiliation, loss of capacity to enjoy life, mental

---

[20]Boilerplate language that that used by Plaintiff does not allow Plaintiff to recover front pay or punitive damages. *See Johnson v. Safe Auto Insurance Company,* No. 15-00259, 2015 WL 12806579 at *1–2 (W.D. Mo. Aug. 5, 2015) ("Plaintiff did not plead punitive damages, which Missouri law requires be specifically stated in a petition."); *see also Logan v. Value City Department Stores, LLC,* No. 4:08-cv-19, 2008 WL 1914168 at *3 (E.D. Mo. April 28, 2008) ("vague prayers for 'other appropriate relief' and 'other legal and equitable relief'" are not construed as a claim for punitive damages).

and emotional distress, and other non-pecuniary losses," and "costs and attorney's fees." Notably, Plaintiff did not make any reference to or request front pay or punitive damages. [SOP 71]

- In Interrogatory No. 16, American Family sought to have Plaintiff state each and every category of damages she seeks in this case, including front pay and punitive damages. Plaintiff responded without objection and listed the categories of damages she seeks, making no reference to front pay or punitive damages. Instead, Plaintiff's Answer to Interrogatory No. 16 references her Initial Disclosures and provided further information on her back pay damages. [SOP 72]

- Plaintiff later endorsed her Initial Disclosures and her Answer to Interrogatory 16 at her deposition, admitting their completeness in listing the categories of damages she seeks in this lawsuit. [SOP 74]

Based on the above, Plaintiff abandoned any claim for front pay or punitive damages. *See National Ass'n of Home Builders v. Norton,* 298 F. Supp. 2d 68, 71 at n.1 (D.C. Cir. 2003) (plaintiffs abandoned claim under the Federal Advisory Committee Act, 5 U.S.C. App. § 1, in part because they did not aver any distinct injury in either their complaint or discovery responses). Thus, American Family is entitled to judgment as a matter of law on any claim for front pay or punitive damages because it was not previously asserted in Plaintiff's Amended Complaint.

## V. CONCLUSION

For the foregoing reasons, American Family is entitled to summary judgment on Plaintiff's age discrimination claim and for any other such further relief granted by the Court.

Respectfully submitted,

/s/ Curtis R. Summers
Curtis R. Summers, MO #58352
Alyssa S. Gonnerman, MO #67137
LITTLER MENDELSON, P.C.
1201 Walnut, Suite 1450
Kansas City, MO  64106
Telephone: 816.627.4400
Facsimile: 816.627.4444
csummers@littler.com
agonnerman@littler.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of May, 2020, the above and foregoing was sent through the Court's ECF filing system to:

Susan Montee
James Montee
Amanda Montee
Jeffrey P. Blackwood
P.O. Box 127
St. Joseph, MO 64502
(816) 364-1650
(816) 364-1509 Fax
smontee@monteelawfirm.com
monteelaw@outlook.com
amontee@monteelawfirm.com
jblackwood@monteelawfirm.com

**ATTORNEYS FOR PLAINTIFF**

/s/ Curtis R. Summers
Attorney for Defendant

31